CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

FEB 26 2013

JULIA A. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 3:12CR00026 |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| DWAIN EDWARD WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | By: B. WAUGH CRIGLER |
| | ) | U.S. MAGISTRATE JUDGE |

In accordance with the provisions of Title 28 U.S.C. § 636(b)(3), and upon the defendant's consent, this case was referred to the undersigned to conduct a plea hearing.

**DEFENDANT'S RESPONSES TO RULE 11 INQUIRY**

The Grand Jury returned a multiple-count Indictment charging defendant in **Count One** with knowingly and intentionally conspiring to manufacture, possess, and distribute over fifty (50) grams of methamphetamine, a Schedule II controlled substance in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (b)(1)(A); in **Count Two** with knowingly and intentionally manufacturing over fifty (50) grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A); in **Count Three** with knowingly and intentionally possessing pseudoephedrine, a listed chemical as defined in Title 21, United States Code, Section 802, with intent to manufacture methamphetamine, a Schedule II controlled substance, in a manner other than authorized by Title 21, United States Code, Sections 801 through 904, all in violation of Title 21, United States Code, Section 841(c)(1); and in **Count Four** with, while manufacturing and attempting to manufacture methamphetamine, a Schedule II controlled substance, creating a substantial risk of harm to human life, all in violation of Title 21, United States Code, Section 858. Defendant has entered into a plea agreement to plead guilty to a lesser included offense relating to one of the objectives alleged in Count One; namely,

conspiring to manufacture more than five (5) grams of methamphetamine, a controlled substance, in violation of Title 21, United States Code Sections 846 and 841(b)(1)(B).

On February 21, 2013, a plea hearing was conducted before the undersigned. The defendant was placed under oath and testified that his full legal name is Dwain Edward Williams, he was born on May 3, 1969, and he graduated from high school. The defendant stated that he can read, write, and understand the English language. The defendant further stated that he was fully aware of the nature of the charges against him and the consequences of pleading guilty to those charges. The defendant informed the court that he takes insulin, but that he suffered no condition that impaired his ability to understand what the court was saying or the nature of the proceedings. The defendant testified that he had received a copy of the Indictment pending against him, and that he had fully discussed the charges therein and any defenses thereto, and his case in general, with his counsel. The defendant stated that he was pleading guilty of his own free will because he was, in fact, guilty. The defendant testified that he understood that the lesser included offense in Count One is a felony, and if his plea is accepted, he will be adjudged guilty of that offense. The defendant acknowledged awareness that if he complies with the plea agreement, the government has agreed to move for his dismissal from the remaining counts of the Indictment. The defendant agreed that the government nevertheless had probable cause to bring the charges and that he would not be considered a prevailing party on any counts that were dismissed. The defendant further acknowledged that the plea agreement only binds the United States Attorney's Office for the Western District of Virginia and no other state or federal prosecutor or enforcement agency.

The defendant acknowledged that the maximum statutory penalty for Count One is a $5,000,000 fine and/or imprisonment for a term of forty years, together with a term of supervised release, and that the minimum penalty is five years imprisonment. The defendant was informed that parole has been abolished, and that if he is sentenced to prison, he will not be released on

2

parole, but on supervised release, a violation of which could result in additional incarceration. The government was not seeking forfeiture, but the defendant stated that he abandoned any interest in the items seized as evidence in the prosecution of this case. The defendant was informed that he may be required to pay restitution for the clean-up of a methamphetamine lab, and, if so, must make a good faith effort to do so. Finally, the defendant testified that he understood that, upon conviction, he will be required to pay a mandatory assessment of $100 per felony count of conviction.

The defendant was informed that under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow in determining the sentence in a criminal case. The defendant was then informed that the Sentencing Guidelines are no longer mandatory, but the sentencing judge may apply them in an advisory fashion in determining a reasonable sentence. The defendant testified that he and his counsel had discussed how the Sentencing Guidelines might apply in his case. The defendant also testified that he understood that the court would not be able to determine the applicable guideline range, for advisory purposes, until after a presentence report has been prepared and both parties have been given an opportunity to challenge the reported facts and application of the Guidelines. The defendant stated that he understood that the eventual sentence imposed may be different from any estimate his attorney had given him, or any recommendation by the government, and that the court has the authority to impose a sentence that is either higher or lower than that called for by the Guidelines, so long as the sentence is not greater than the statutory maximum for the offense to which the defendant is pleading guilty.

The defendant acknowledged it was agreed that the 2012 edition of the United States Sentencing Guidelines Manual is applicable. The defendant further acknowledged that, in the Plea Agreement, it had been stipulated that Sentencing Guidelines 2D1.1(c), 2D1.1(b)(1), and 2D1.1(b)(12) are applicable to his conduct, but that the government will recommend a sentence

3

at the low end of the guideline range. The defendant also stated that he understood that even if he fully cooperates with law enforcement, the government is under no obligation to file a motion to reduce his sentence for substantial assistance, and if the government makes the motion, it is up to the court to determine how much of a departure, if any, should be made. The defendant stated that he understood that, contingent upon his acceptance of responsibility and continued cooperation in the sentencing process, and fulfillment of his duties under the Plea Agreement, the government will recommend a two-level (2) reduction under USSG § 3E1.1(a), and, if applicable, the government will move that he be given an additional one-level (1) reduction under USSG § 3E1.1(b). The defendant agreed that he had knowingly and voluntarily waived his rights to request or receive any records pertaining to the investigation or prosecution of his case, including any records that may be sought under the Freedom of Information Act or the Privacy Act of 1974. The defendant agreed he would submit a financial statement, if called upon to do so. He further agreed that from the time of his signing of the plea agreement, or the date he signs the financial statement, whichever is earlier, he would not convey anything of value without authorization from the government. The defendant acknowledged his monetary obligations under the plea agreement, which calls for such to be due immediately and subject to immediate enforcement.

The defendant acknowledged that he was waiving his right to have a jury determine beyond a reasonable doubt the facts alleged in the Indictment, including any facts related to sentencing. The defendant testified that he understood that he had the right to a trial by a jury, in addition to the following rights, which will be waived or given up if his guilty plea is accepted:

1. The right to plead not guilty to any offense charged against him;
2. The right at trial to be presumed innocent and to force the government to prove his guilt beyond a reasonable doubt;
3. The right of assistance of counsel at trial and in any subsequent appeal;
4. The right to see, hear, and cross-examine witnesses;

5. The right to call witnesses to testify on his own behalf and to the issuance of subpoenas or compulsory process to compel the attendance of witnesses;
6. The right to decline to testify unless he voluntarily elects to do so in his own defense;
7. The right to a unanimous guilty verdict; and
8. The right to appeal a guilty verdict.

The defendant testified that he understood that, under the terms of the agreement he was waiving his rights to appeal, but that he was not waiving his right to appeal or have his attorney file a notice of appeal as to any issue which cannot by law be waived. The defendant acknowledged that he had agreed to waive his right to collaterally attack any order issued in the case, unless such attack is based on ineffective assistance of counsel or a constitutional defect in jurisdiction. The defendant was informed that if he chose to appeal, the government could treat this as a breach of the plea agreement and recharge him.

The defendant testified that he understood that he may be deprived of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess a firearm. The defendant stated that he was satisfied with the advice and representation given to him in this case by his counsel, and that he believed the representation had been effective. The defendant asked the court to accept his plea of guilty to the lesser charge in Count One.

**THE GOVERNMENT'S EVIDENCE**

The defendant and the Government agreed to a Stipulation of Facts. The Stipulation of Facts having been filed in open court, the evidence presented therein regarding the offenses charged is as follows:

A Confidential Informant ("CI-1") witnessed Williams cook methamphetamine from boxes of pseudoephedrine on multiple occasions. CI-1 was familiar with Williams' method in

5

cooking methamphetamine and provided a detailed description of the chemicals and processes Williams used. In his cooks, Williams used pseudoephedrine and red phosphorous. Williams rendered pseudoephedrine from cold pills purchased from pharmacies near his residence; red phosphorous came from striker plates found on boxes of matches. CI-1 stated that Williams used between 2 and 5 boxes or 4.8 and 12 grams of pseudoephedrine per batch in manufacturing methamphetamine. Williams would have to separate the pseudoephedrine from the other ingredients in the cold pills, and then, he would cook that pseudoephedrine into methamphetamine. When Williams cooked methamphetamine, each gram of pseudoephedrine used in a cook yielded anywhere from .5 gram to .8 grams of actual methamphetamine. For instance, if Williams used 6 grams of pseudoephedrine he would yield anywhere from 3 to 5 grams of actual methamphetamine. This yield described by CI-1 was consistent yield estimates calculated by a DEA expert in the field of methamphetamine manufacturing. In addition, the process of separating pseudoephedrine from the other ingredients in the cold pills also caused some loss in pseudoephedrine. The amount of pseudoephedrine loss at this stage varied.

CI-1 also stated that between February 2011 and July 2012 Williams exchanged pseudoephedrine for methamphetamine with various unnamed persons. According to CI-1, the unnamed persons provided Williams with pseudoephedrine and other necessary chemicals used to produce methamphetamine, and Williams agreed to cook methamphetamine. When the cook was completed, Williams and the unnamed persons would split the quantity of methamphetamine produced in the cook. According to CI-1, in addition to himself/herself, two other individuals supplied pseudoephedrine to Williams in order to for them to make methamphetamine.

According to another Confidential Informant ("CI-2"), on or about August 2011, CI-2 bought Williams methamphetamine cooking supplies. In addition, CI-2 stated that he/she helped Williams cook methamphetamine at Williams' residence on multiple occasions between February 2011 and July 2012. In exchange for CI-2's assistance, Williams gave CI-2 a portion of the methamphetamine that they cooked. All methamphetamine manufacturing activities and transactions between CI-2 and Williams occurred prior to CI-2 becoming a government informant.

**Controlled Exchanges**

Under the supervision of agents with Blue Ridge Drug and Gang Task force and the Drug Enforcement Agency, CI-1 performed the following controlled exchanges of pseudoephedrine for methamphetamine with Williams:

On May 23, 2012, CI-1 went to Williams' residence to purchase methamphetamine under law enforcement supervision while secretly wearing video recording equipment. Williams did not sell CI-1 any methamphetamine but did provide the CI-1 with methamphetamine scrapings from a plate. Lab test confirmed the presence of methamphetamine in the scrapings.

On May 24, 2012, CI-1 delivered two boxes of cold pills containing pseudoephedrine to Williams at his residence. The delivery was monitored, recorded, and supervised by law enforcement. During the delivery, Williams agreed to cook a batch of methamphetamine with the cold pills. CI-1 scheduled a time to return to pick up methamphetamine from Williams as payment for the cold pills. CI-1 observed Williams manufacturing methamphetamine inside the residence at that time. On May 31, 2012, CI-1 went to Williams' residence to pick up methamphetamine, but Williams told CI-1 that he did not have methamphetamine for CI-1 as

7

promised. Williams promised to give CI-1 some methamphetamine very soon as payment for the cold pills. Williams then told CI-1 that methamphetamine would be ready soon because Williams claimed that he had already made "red and black"—referring to red phosphorus and black iodine used in manufacturing methamphetamine. On April 27, 2012, Williams showed up at CI-1's home and delivered a small quantity of methamphetamine to CI-1. Although no law enforcement personnel were present during this delivery, CI-1 called law enforcement immediately after Williams left CI-1's home, and CI-1 gave the methamphetamine that Williams had delivered to law enforcement. On June 1, 2012, CI-1 received another small amount of methamphetamine from Williams, and Williams told CI-1 that he would have more methamphetamine ready at a later time. Immediately after the exchange, CI-1 met with investigators and turned over the methamphetamine to law enforcement. On July 18, 2012, CI-1 received another amount of suspected methamphetamine from Williams in exchange for the previously delivered pseudoephedrine pills. Immediately after the exchange, CI-1 met with law enforcement and turned over the methamphetamine provided to CI-1 by Williams.

Subsequent lab tests confirmed the substances recovered during the controlled exchanges to be methamphetamine. Lab tests showed that the total amount of methamphetamine recovered during the controlled exchanges was 0.458 grams of actual methamphetamine.

**Pseudoephedrine Purchase Logs**

DEA and the Blue Ridge Drug and Gang Task Force collected pseudoephedrine purchase logs in the area around Williams' residence. Because of its use in methamphetamine manufacturing, pseudoephedrine purchases are logged and tracked by pharmacies. When a person buys a quantity of pseudoephedrine, the pharmacy will record the amount of

8

pseudoephedrine purchased, record the purchaser's ID or driver's license, and require a signature for the purchase. The pseudoephedrine purchase logs from the pharmacies around Williams' residence showed that Williams purchased 172 grams of pseudoephedrine between February 19, 2011 and July 26, 2012. The calculations of 172 grams of pseudoephedrine equal approximately between 35 and 50 grams of actual methamphetamine given Williams' cooking technique and results witnessed by cooperators.

After his indictment in September 2012, law enforcement agents arrested Williams and executed a search warrant on his residence. During the search, agents discovered a plastic soda bottle assembly where plastic tubing connected a soda bottle to a smaller plastic vitamin jar and an electric pump. Inside the soda bottle assembly agents found a chemical mixture. Lab tests of the chemical mixture showed that it contained just over 8 grams of pseudoephedrine. Agents also recovered Coleman fuel, hydrogen peroxide, rubbing alcohol, and muriatic acid (all commonly used methamphetamine cooking agents) inside Williams' residence. A jar containing suspected methamphetamine in its form bi-level liquid form was also recovered. Additionally, investigators recovered a pistol inside Williams' home. The pistol was found sitting on a counter in the kitchen of the residence.

**FINDINGS OF FACT**

Based on the evidence presented at the plea hearing, the undersigned now submits the following formal findings of fact, conclusions and recommendations:

(1) The defendant is fully competent and capable of entering into a plea agreement and making an informed plea;

(2) The defendant is aware of the nature of the charges and the consequences of his plea;

9

(3) The defendant knowingly and voluntarily entered a plea of guilty to the lesser included offense in Count One of the Indictment; and

(4) The evidence presents an independent basis in fact containing each of the essential elements of the offenses to which the defendant is pleading guilty.

**RECOMMENDED DISPOSITION**

Based upon the above findings of fact, the undersigned RECOMMENDS that the court accept the defendant's plea of guilty to the lesser included offense in Count One of the Indictment. The undersigned DIRECTS that a presentence report be prepared. A sentencing hearing hereby is scheduled for May 20, 2013 at 10:00 a.m. before the presiding District Judge in Charlottesville.

**NOTICE TO PARTIES**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C): Within fourteen days (14) after being served with a copy of this Report and Recommendation, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. The presiding District Judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The presiding District Judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the undersigned. The judge may also receive further evidence or recommit the matter to the undersigned with instructions.

Failure to file timely written objections to these proposed findings and recommendations within fourteen days could waive appellate review. At the conclusion of the fourteen-day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk is hereby directed to send a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: ⁄s⁄ *signature*
United States Magistrate Judge

02-26-2013
Date